## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| CHARLOTTE MONDAY and | ) | |
| DARLENE PATTON, | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-00075-CHS |
| | ) | |
| LA-Z-BOY INCORPORATED, | ) | |
| *Defendant*. | ) | |

## MEMORANDUM OPINION

### I.    Introduction

In March 2020, La-Z-Boy, Inc. ("La-Z-Boy" or "Defendant") shut down its manufacturing plant in Dayton, Tennessee, in response to the global-wide COVID-19 pandemic. At that time, Plaintiffs Charlotte Monday ("Ms. Monday" or "Plaintiff") and Darlene Patton ("Ms. Patton" or "Plaintiff") were furloughed along with 1,432 other employees. Although Defendant recalled many of its employees three months later, Plaintiffs were not among those recalled. As a result, they bring claims for age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq.* Plaintiff Monday also brings claims against Defendant under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Defendant has moved for summary judgment as to all claims. [Doc. 22]. For the reasons stated herein, Defendant's Motion for Summary Judgment will be **GRANTED** and an appropriate order will be entered.

### II.    Facts

In March 2020, the world was in the midst of the COVID-19 pandemic. La-Z-Boy was one of many institutions and businesses that shut down as a result of the pandemic. On March 7, 2020, La-Z-Boy mailed a letter to the employees at its Dayton, Tennessee, manufacturing plant (the "Dayton Plant") where Plaintiffs were employed in a variety of manufacturing positions. The

1

purpose of the letter to was to inform the employees that the Dayton Plaint was closing due to the

pandemic. The letter stated in relevant part:

> In response to government orders and changed marketplace conditions, we are temporarily closing most of our facilities in the United States.

> \*      \*      \*

> As discussed, your position is impacted by this furlough. This is intended to be a temporary furlough, while our country responds to the COVID-19 pandemic . . . The crisis has been an unforeseeable and quickly evolving event that we never imagined as we planned for the end of our fiscal year 2020.

> \*      \*      \*

> At this time, we cannot predict the full length of this furlough, but we will notify employees as soon as we are able to recall them to work.

> \*      \*      \*

> We look forward to the time not so far into the future when we are up and running to respond to pent-up customer demand.

(La-Z-Boy letter to employees, Page ID # 211). Attached to this letter was a "Furloughed

Employees FAQ" which, among other information, provided the following information:

> Q:     What is a furlough?

> A:     Furlough is an involuntary unpaid leave as we idle our facilities in response to the COVID-19 pandemic. In general employees can expect to be able to return to work after a period of time.

> \*      \*      \*

> Q:     How will I know when I can Return to Work?

> A:     Your manager/ supervisor will notify you directly when your facility is able to return to work. If you have questions while you are out please contact your direct supervisor.

> \*      \*      \*

> Q:     Is it possible that I could get permanently laid off?

A:     At this time, we are anticipating returning our employees to work at the end of the furlough period, although we do not have a date at this time. In the event we determine that the furlough must be extended, or that permanent job cuts are required, we will notify affected employees as quickly as possible.

(Furloughed Employees FAQ, Page ID # 213-14). La-Z-Boy furloughed 1,434 of the 1,454 employees at its Dayton Plant, including the two Plaintiffs. (Defendant's April 12, 2021, EEOC Position Statement, Page ID # 205). About three months later, in June 2020, Defendant closed its manufacturing plant in Newton, Mississippi, and shifted that work to the Dayton Plant which it then reopened. (SEC Form 10-Q, Page ID # 318). In May 2020, Defendant began to recall some of the furloughed employees. (W. Everett decl. ¶ 6, Page ID # 62). In addition, open positions were posted on electronic bulletin boards throughout the Dayton Plant. (T. Everett, ¶ 8, Page ID # 76). La-Z-Boy also began an aggressive advertising campaign in Dayton and the surrounding Tennessee counties soliciting employees to fill manufacturing jobs at the Dayton Plant. (Page ID ## 341-417). The advertising campaign seeking new employees consisted of thousands of ads in local newspapers, radio, direct mail, and social media. *Id.* In September 2020, La-Z-Boy also had someone stand on a prominent street corner in Dayton holding up a large placard advertising "LA-Z-BOY is HIRING! Starting at $15.00 per hour." (Page ID # 188).

During the latter months of calendar year 2020, Defendant's total number of employees at the Dayton Plant swelled to 2,169 employees. And in calendar year 2021, the workforce at the Dayton Plant reached 3,361 employees. (Page ID # 324). These numbers were derived from the Form W-2s issued by Defendant for its employees each year.[1] The Court notes that it is possible not all employees were employed at the same time each year; however, these employee totals based

---

[1] The total number of employees fell to 2552 in 2022. (Page ID # 324).

3

on the number of W-2 forms are an indicator that the number of jobs increased significantly at the Dayton Plant during the latter part of 2020 and in 2021.

In early August 2020, La-Z-Boy notified Plaintiffs Monday and Patton that, "[e]ffective March 29, 2020 you were classified as laid off from La-Z-Boy. If you are not recalled by September 29, 2020, your classification will change to retirement." (August 2020 letter to Monday, Page ID # 217; Patton decl. ¶ 7, Page ID # 197). Neither Ms. Monday nor Ms. Patton was recalled by September 29, 2020. Consequently, they were deemed "retired" and were terminated from La-Z-Boy. In La-Z-Boy parlance, "retired" simply meant that Plaintiffs were eligible for certain retirement benefits because they were older than 55 and had at least 10 years of service with La-Z-Boy. (T. Everett decl. ¶ 13, Page ID # 78).

Each Plaintiff filed an administrative charge with the EEOC alleging a violation of the ADEA. The EEOC issued right-to-sue letters for both Plaintiffs on February 25, 2022, and Plaintiffs timely filed this action on March 28, 2022. [Doc. 1]. An examination of the facts specific to each Plaintiff's claim follows.

### A.    Charlotte Monday

Plaintiff Monday was born in 1954. She began her employment in February 1994 at La-Z-Boy's Dayton Plant. (W. Everett decl. ¶ 13, Page ID # 64). At the time of the March 2020 layoff, she was employed in the "Mechanism (Mech.) Cell 4 operations" in the Metal Supply Center of the Dayton Plant. (W. Everett Decl. ¶¶ 12, Page ID # 64). She worked as part of a team with two other employees, Sofia Shadwick, born in 1962, and Olga Perez, born in 1964. Their supervisor was Wardell Everett. (*Id.* ¶ 3, 6, 12; Page ID # 62-64).

On February 25, 2020, Ms. Monday's grandson was tragically killed in a motorcycle accident. Ms. Monday took a four-day bereavement leave, followed by an approved FMLA leave

of four weeks. (Monday decl. ¶ 3, Page ID # 170.) Her FMLA leave began on March 2, 2020, and she was to report back to work on Monday, March 30, 2020. (*Id.*; T. Everett decl. ¶ 6, Page ID # 76). However, before she could return from FMLA leave, the Dayton Plant shut down due to the pandemic. (Monday decl. ¶ 4, Page ID # 170). At that time, in addition to 1,431 other employees, La-Z-Boy furloughed the members of the Mech. Cell 4 operations: Ms. Monday, Perez, and Shadwick. (W. Everett decl. ¶ 4, Page ID # 76).

At the end of June 2020, Ms. Monday heard that La-Z-Boy was recalling some employees. She went to Human Resources and spoke with Teressa Everett, Human Resources Manager at the Dayton Plant, about when she would be recalled and also about her health insurance. (Monday decl. ¶ 5, Page ID # 171). Teressa Everett did not know when Ms. Monday would be recalled. (*Id.*) Later that same month, Plaintiff sent text messages to Teressa Everett and two of her supervisors, Wardell Everett and "Boss DeWayne," stating she wanted to return to work. (*Id.* ¶ 5, Page ID # 171; Text messages, Page ID # 176-79). Wardell Everett texted that Ms. Monday should speak to Teressa Everett. (Text message, Page ID # 177). Ms. Monday did not receive a specific response to her return-to-work inquiries. (Text messages, Page ID # 179).

By letter dated August 12, 2020, Defendant notified Ms. Monday that, if she was not recalled by September 29, 2020, her classification would be changed from laid-off to retired. (Aug. 12, 2020 letter, Page ID # 191, brackets added). The letter advised her generally about her COBRA rights relating to her health, dental and vision insurance and also stated, "[i]f you reapply for employment and are rehired after your period of recall you must wait 60 days from your first day back at work to become eligible to participate in the health care plan." (*Id.*). By letters dated September 22, 2020, Plaintiff wrote Don Mather, Vice President; Teressa Everett, Human Resources; and Kelly Brown, Human Resources, stating she wanted to return to work to "my same

5

job" and that she did not want to retire. (Letters, collectively, Page ID # 181-86). In response, Defendant sent a revised letter dated September 24, 2020, in which Ms. Monday was told that, if she was not recalled by September 29, 2020, "your employment will end." (Aug. 24, 2020 letter, Page ID # 193). Like the August 12 letter, this letter similarly advised Ms. Monday as to her insurance rights under COBRA and her insurance rights if she reapplied and was rehired after September 29, 2020. (*Id.*).

According to La-Z-Boy, when it began recalling employees to work, it followed the recall procedures provided by its pre-existing reduction-in-force policy ("RIF Policy"). (W. Everett decl. ¶ 7, Page ID # 63). The RIF Policy states in relevant part:

**REDUCTION-IN-FORCE**

La-Z-Boy is committed to business practices that result in a stable environment. When confronted with the need to operate with fewer employees because of business requirements, such as new technology, changes in methods, economic changes, etc., La-Z-Boy will initiate reductions in force in a way it determines to be fair and reasonable *subject to its business needs.*

Reduced Work and Temporary Layoffs
Reduced Work is considered a period greater than one day and up to five working days. Temporary layoff is greater than one week.

\*       \*       \*

Upon notification of layoff, an employee may bid to an open and available job. If no such job exists, the employee is not qualified for an open and available job, or the employee elects not to bid a job, then the employee will go onto a recall list for up to . . . 26 weeks. . . . Employees will typically be recalled in the reverse order of layoff, but this may vary based on business needs or as the company in its sole discretion determines.

Employees who are not recalled to active employment within 26 weeks . . . will be discharged.

(La-Z-Boy Tennessee Employee Handbook, Page ID # 81-82). The RIF Policy also provides that various criteria may be used in deciding who to layoff "unless business conditions dictate

6

otherwise or the company in its sole discretion determines otherwise." (*Id.* at Page ID # 82.) Those criteria include whether an employee is classified as introductory or temporary, the employee's disciplinary history, and the employee's "skill set proficiencies, quality of work, overall work record, and seniority." (*Id.*). As to recall, the RIF Policy provides, "[e]mployees will typically be recalled in the reverse order of layoff, but this may vary based on business needs or as the company it its sole discretion determines." (*Id.*).

According to Wardell Everett, when he decided to recall employees to the Mech. Cell 4 positions, he did so by seniority. He recalled Shadwick first because she was the most senior, having commenced her employment in February 1990. (W. Everett decl. ¶ 13, Page ID # 65). He then intended to recall both Ms. Monday, hired February 1994, and Perez, hired September 1999. However, Teressa Everett told him that Ms. Monday had stopped by her office earlier that day and said she would like to delay her recall to allow the continuation of her unemployment compensation benefits; and she also understood that Ms. Monday was engaged to be married and was therefore seriously contemplating retirement (*Id.*). Wardell Everett told Teressa Everett he would be glad to remove Ms. Monday from the recall list, which he did. (*Id.*). Teressa Everett's declaration supports Wardell Everett's assertions. (T. Everett decl. ¶¶ 8-12, Page ID ## 76-77). Shortly after Shadwick and Perez returned to the Mech. Cell 4 operations, Wardell Everett realized that they were working efficiently and meeting La-Z-Boy's needs in that department; consequently, he did not need a third person in Mech. Cell 4 operations. (W. Everett decl. ¶ 14, Page ID # 65). Therefore, no one was hired for the third Mech. Cell 4 position during the 26 week recall period, and no one has been hired to fill that position since. (*Id.*).

Ms. Monday admits that she told Teressa Everett that she was engaged, a conversation Ms. Monday says took place before February 25, 2020, before her grandson died; however, she denies

she told Teressa Everett she was contemplating retiring. (Monday decl. ¶¶ 6-7, Page ID # 171). Ms. Monday also vigorously denies that she told Teressa Everett that she would prefer to continue unemployment benefits rather than return to work. (Monday, decl. ¶ 14, Page ID # 172). She avers that she would have accepted another job at the Dayton Plant had she been offered one. (*Id.* ¶ 17, Page ID # 173). She contends that she did not apply for a job at La-Z-Boy after she was "retired" because she assumed it would be a waste of time since La-Z-Boy had already ignored her prior requests to return to work. (*Id.* ¶ 19, Page ID # 173).

## B. Darlene Patton

Plaintiff Patton was employed for many years at the Dayton Plant where she worked second shift as a manual spinner in the Metal Supply Center until her termination on September 29, 2020. (Patton decl. ¶¶ 2, 4, Page ID ## 196-97). In September 2020, La-Z-Boy employed four manual spinner operators on the first shift: Teresa Cook, born 1965; Thomas Wilson, born 1965; Darlene Henderson, born 1969; and Nancy Stinnett, born 1970. Two other people worked with Ms. Patton on the second shift: Cheryl Centenio, born 1954, and Charlotte Dishman, born 1955. Ms. Patton was born in 1963. (T. Everett decl. ¶ 5, Page ID # 75; Patton dep. Page ID ## 75-76, 94).

She performed this job for years with no complaints from her manager, Wardell Everett, even though she had asked him to tell her if he had any problems with her performance. (Patton decl. ¶ 5, Page ID # 197). She was placed on furlough when the Dayton Plant closed due to the pandemic in March 2020. (*Id.* ¶ 3, Page ID # 196). Sometime after the Dayton Plant shut down, she learned employees were being recalled. She called Wardell Everett to ask about being recalled and he referred her to Teressa Everett. (*Id.* ¶ 6, Page ID # 197). She called Teressa Everett who told her that several other manual spinners had been recalled; however, she also said there was no work for her yet. (*Id.*) After receiving the August letter from Defendant stating that, if she was not

recalled by September 29, 2020, she would be "retired," she contacted Teressa Everett to say she did not want to retire, she wanted to return to work. Teressa Everett would not give her much information and Ms. Patton's manager, Wardell Everett, would not talk to her. (*Id.* ¶¶ 7-8, Page ID ##197-98). She would have taken another job if one had been offered to her. (*Id.*). Ms. Patton was not recalled and her employment was then terminated. (*Id.* ¶ 12, Page ID # 199). According to Ms. Patton, after La-Z-Boy "retired" her, it was obvious to her that La-Z-Boy did not want her back so she did not reapply for another position. (*Id.*).

According to Wardell Everett, when La-Z-Boy began recalling employees, he decided to first recall the first shift manual spinner operators, i.e., Cook, Wilson, Henderson, and Stinnett. (W. Everett decl. ¶ 6, Page ID # 62-63). Later, on June 1, 2020, he recalled two second-shift manual spinner operators, Centenio and Dishman. (*Id.*). He did not recall Ms. Patton to work because he was unsure that he would need additional personnel in that position given the continuing uncertainty regarding product demand during the pandemic and because Ms. Patton was, in his judgment, the least efficient of all the operators. (*Id.* ¶¶ 8- 9). In the most recent 12 week period leading up to the mass furlough, Ms. Patton had consistently ranked at or near the bottom in productivity ratings among the first and second shift manual spinners. (*Id.* ¶¶ 8-9, *see also* Ex. 3 attached thereto, Chart of efficiency history in 2020). Wardell Everett stated that he used the reduction-in-force policy—which permits consideration of an employee's overall proficiency and work quality—to decide not to recall Ms. Patton. (*Id.* ¶¶ 7-8). As La-Z-Boy argues in its reply brief, Wardell Everett's decision was not based on a conclusion that Ms. Patton's performance was unacceptable—just that she was the least proficient manual spinner—and Ms. Patton produced no evidence to rebut this contention. Thereafter, Wardell Everett concluded that La-Z-Boy was

9

operating well without the additional manual spinner, and no one has been hired into that position since the initial furlough. (*Id.* ¶ 10).

## III.  Standard of Review

Fed. R. Civ. P. 56(c) provides that summary judgment will be rendered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to show that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The moving party may satisfy its burden by presenting affirmative evidence that negates an element of the nonmoving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-35 (1985); *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). There are "no express or implied requirements in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim;" it is enough for the movant to "point[ ] out" an absence of evidence on an essential element of the non-movant's claim. *Celotex*, 477 U.S. at 323-25; *see also Harvey v. Campbell Cnty, Tenn.*, 453 F. App'x 557, 560 (6th Cir. May 10, 2011).

Once the moving party has fulfilled his initial burden under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to "go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324-25; *see also 60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled

to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986); *60 Ivy Street*, 822 F.2d at 1435-36.

## IV. Analysis

### A. Plaintiffs' Age Discrimination Claims

The ADEA prohibits an employer from discharging or otherwise discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment because of the individual's age. 29 U.S.C. § 623(a)(1); s*ee also Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014). To prevail on an ADEA claim, a plaintiff at all times bears the burden of persuasion to show by a preponderance of the evidence that "but for" his age, the employer would not have undertaken the adverse employment decision against him. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 806 (6th Cir. 2020) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009) (footnote omitted)). A plaintiff may prove his claim either by direct evidence or circumstantial evidence. *Willard*, 952 F.3d at 806 (citing *Geiger v. Tower Auto*., 579 F.3d 614, 620 (6th Cir. 2009)). "Direct evidence is evidence that proves the existence of a fact without requiring any inference." *Willard*, 952 F.3d at 806 (internal citation omitted). Plaintiffs do not contend they have direct evidence of age discrimination to prove their claims. Thus the Court turns to circumstantial evidence.

Circumstantial evidence "'allow[s] a factfinder to draw a reasonable inference that discrimination occurred.'" *Willard*, 952 F.3d at 807 (citing *Geiger*, 579 F.3d at 620). ADEA claims using circumstantial evidence are analyzed under the burden-shifting framework provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 ((1973); *Willard*, 952 F.3d at 807 (citing *Pierson*, 749 F.3d at 536).

The Sixth Circuit has explained this framework as follows:

> First, the plaintiff must produce "evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination" before the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. Then, the plaintiff must rebut the proffered reason by producing "evidence from a which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination."

*Willard*, 952 F.3d at 807 (internal citations omitted). Thus, while "the *McDonnell Douglas* burden-shifting framework allocates the burden of production and provides an order for the presentation of proof in employment discrimination cases . . . [a]t the pretext stage, the plaintiff's burden of production 'merges' with his ultimate burden of persuasion to show that age discrimination was the but-for cause of his termination." *Willard*, 952 F.3d at 807 (internal citations omitted and citation cleaned up).

Moving to the prima facie case, a finding as to what constitutes the elements of the prima facie case depends on the specific nature of Plaintiffs' claims. Defendant asserts that Plaintiffs were terminated in a reduction-in-force ("RIF") and, therefore, the prima facie case for an RIF, which has a "heightened" fourth element, must be applied.

Generally, to establish a prima facie case of age discrimination under the *McDonnell Douglas* framework, a plaintiff must show: (1) he is a member of a protected group, in this case, over the age of 40; (2) he is qualified for the position; (3) the employer has taken an adverse employment action against him; and (4) the employer replaced the employee with a younger

12

employee or the employee treated a similarly situated person outside the protected class better than him. *Willard*, 952 F.3d at 808 (citing *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012)).

If this case is to be analyzed as discrimination occurring during an RIF, however, the fourth element is modified to require a plaintiff to come forward with "'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). This element is sometimes described as "heightened" because "as long as employers do not act with discriminatory intent, they may eliminate positions in the name of economic necessity or efficiency, even when those positions are held by [persons in a protected class]." *Hightower v. Keystone Auto. Indus.*, No. 5:21-cv-1792, 2023 WL 1412917, at *4 (N.D. Ohio Jan. 31, 2023) (brackets original) (citing *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 517 (6th Cir. 1991)).

Plaintiffs dispute that an RIF at the Dayton Plant took place. Instead, Plaintiffs assert that La-Z-Boy temporarily "furloughed" or "laid-off" its employees and shortly thereafter ramped up its operations after bringing the Newton, Mississippi, operations to the Dayton Plant and after beginning a recall of the furloughed Dayton Plant employees.

To begin, regardless of what La-Z-Boy may have initially called the shut down of the plant—a furlough or a layoff—and regardless of whether it was temporary or permanent, the shutdown constituted an RIF as defined by the Sixth Circuit:

> [a] work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated *as part of a work force reduction* when he or she is replaced after his or her discharge. [2] However, a person is not replaced when another employee is

---

[2] In other words, the "job elimination" is not considered to be caused by a "work force reduction" if another person is then hired to do that same job.

13

assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

[emphasis added]. *Pierson*, 749 F.3d 537 (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)).

An extraordinary, once-in-a-hundred-year pandemic created business conditions which caused La-Z-Boy to shut down manufacturing operations and temporarily eliminate 1,435 positions at the Dayton Plant in March 2020 until it began a recall in June 2020. Plaintiffs argue, however, that because La-Z-Boy began hiring hundreds of new employees at the same time it began recalling old employees, the initial furloughs could not have been an RIF. The Court does not agree. The Sixth Circuit's definition of an RIF does not specify that the RIF must be permanent. For approximately three months the Dayton Plant was shut down due to business considerations created by the pandemic. During that time, only a 20 person skeleton crew remained employed at the site. And during that three month period, no one was hired or reassigned to fill the jobs of the 1,435 employees who were furloughed. The Court concludes the Plaintiffs were initially furloughed pursuant to a temporary three month RIF.

Because Plaintiffs were initially furloughed pursuant to an RIF, La-Z-Boy argues that Plaintiffs must establish a prima facie case for age discrimination pursuant to the standard used for an RIF. Again, the Court disagrees. Plaintiffs do not assert they were discriminated against as a result of the Defendant's decision to engage in an RIF or to furlough almost all of its Dayton Plant employees. Indeed, such a claim would be without any merit since virtually *all* the manufacturing employees at the Dayton Plant (regardless of age) were furloughed as a result of the pandemic. Rather, Plaintiffs assert that "Defendants discriminated against [them] on the basis of [their] age

14

*by not allowing [them] to return to work following the COVID layoff* and then retiring [them] in

violation of 29 U.S.C. § 623, et seq." (Complaint ¶¶ 20-21, Page ID # 4) (emphasis added).

It is undisputed that the plant shutdown ended in June 2020 when La-Z-Boy began recalling

some furloughed employees and hiring new employees at the Dayton Plant. La-Z-Boy's failure to

return the Plaintiffs to work after the Dayton Plant reopened—not the initial furlough—forms the

basis of Plaintiffs' claims. More specifically, Plaintiffs allege that Defendant's adverse,

discriminatory employment decision occurred at two points: (1) when La-Z-Boy did not recall

Plaintiffs to their former positions; and (2) when La-Z-Boy did not assign Plaintiffs different

positions than those they had formerly held. Therefore, the Court will apply the prima facie

standard for allegations of "failure to recall" or "failure to rehire."

It is well-established in this Circuit that to make a prima facie case for age discrimination

for a failure to recall or rehire an employee, an employee must show the following:

> (1) that he is a member of the protected age group;
> (2) that he is qualified for the rehire or recall position;
> (3) that he applied for the available position or can establish that the employer
>     was otherwise obligated to consider him; and
> (4) that the position went to a younger individual outside the protected class or
>     that other reasonable evidence exists for inferring that he was denied a
>     position because of his age.

*Wanger v. G.A. Gray Co*., 872 F.2d 142, 145 (6th Cir. 1989); *see also Cook v. Stewart Trumbull*

*Mem. Hosp., Inc.,* No. 4:20-cv-144, 2021 WL 9204252, *4 (N.D. Ohio April 30, 2021).

The Court will examine the prima facie case as it applies to a claim for failure to *recall*

Plaintiffs to their old positions, and then will examine the prima facie case as it applies to a claim

for failure to *rehire* Plaintiffs into other positions.

15

### 1. Failure to Recall Plaintiff Monday to Former Position

While it is not clearly articulated, Plaintiff Monday appears to be making two separate claims for failure to recall her to her former position: (1) failure to recall her before another former Mech. Cell 4 employee was recalled; and (2) failure to recall her to a Mech. Cell 4 position after all other former Mech. Cell 4 employees were recalled.

The unrebutted evidence in this case is that, after the shutdown, La-Z-Boy permanently eliminated one Mech. Cell 4 position. As a result, there was one fewer Mech. Cell 4 position than there were former employees seeking to be recalled. Ms. Monday asserts that, because Wardell Everett stated he was recalling employees in the Mech. Cell 4 operations by seniority, she should have been recalled before Perez—who was hired in 1999—while Ms. Monday was hired in 1994.

Turning to the first and second elements of the prima facie case, La-Z-Boy has conceded that Ms. Monday, born in 1954, was a member of the protected age group and that she was qualified for the position of Mech. Cell 4. Concerning the third element, the unrebutted evidence shows that La-Z-Boy was recalling former Mech. Cell 4 employees to those positions by seniority and Ms. Monday was more senior than Perez. As to the fourth element, La-Z-Boy asserts that Perez was not outside the protected age group, and, consequently, Ms. Monday cannot establish the fourth element of the prima facie case. But, Perez, born in 1964, was approximately ten years younger than Ms. Monday, born in 1954.

In this Circuit, the fourth element can be shown where the age difference between the employee recalled and the employee not recalled is greater than six years. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283-84 (6th Cir. 2012) (citing *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336-338 (6th Cir. 2003)). An age difference of ten years is considered sufficient for purposes of establishing the fourth element. *Id.* The Court concludes that Ms. Monday has established a prima

facie case for age discrimination as it relates to La-Z-Boy's failure to recall her to a Mech. Cell 4 position before it recalled Perez.

The burden of production then shifts to La-Z-Boy to come forward with evidence to demonstrate that it had a legitimate, nondiscriminatory reason for recalling Perez before Ms. Monday. According to Wardell Everett, he intended to recall Ms. Monday at the same time he recalled Perez, but he did not do so because Teressa Everett advised him that Ms. Monday told her that: (1) she intended to get married and would probably retire; and (2) she wanted to delay her recall so that she could receive unemployment benefits. Further, according to Wardell Everett, after he recalled Perez to the Mech. Cell 4 position, it became clear to him that Perez and the other Mech. Cell 4 employees could complete all the work necessary for the Dayton Plant. In other words, La-Z-Boy did not need another Mech. Cell 4 operator. It is undisputed that Ms. Monday's former position remains unfilled. This explanation constitutes a legitimate, nondiscriminatory reason for not recalling Ms. Monday.

After the employer has articulated a legitimate, nondiscriminatory reason for its decision, the plaintiff must demonstrate that the reason is pretextual to prevail on her claim. *Seegar v. Cincinnati Bell Tel. Co.,* 681 F.3d 274 (6th Cir. 2012). To do this, the plaintiff must demonstrate that the employer's reason: (1) has no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the actions. *Id.* Plaintiff Monday seeks to demonstrate that the nondiscriminatory reason offered by Wardell Everett has no basis in fact. In her affidavit, Ms. Monday vigorously denies that she told Teressa Everett that she did not want to be recalled because she was going to get married, or that she wanted to delay her recall so she could continue to receive unemployment benefits. In response, La-Z-Boy counters that Wardell Everett—who made the

17

recall decision—possessed an honest, good faith belief that Ms. Monday had asked that her recall be delayed.

In response to the argument that Wardell Everett relied upon an honest, good faith belief as to potentially mistaken facts when he made his decision, Plaintiff relies upon the "cat's paw" theory which would attribute the bad motive of an influential subordinate to an innocent decision-maker who took the adverse employment action at issue. The Sixth Circuit in *Marshall v. The Rawlings Company*, 854 F.3d 368 (6th Cir. 2017), discussed these two doctrines and their interplay:

> Under the honest-belief rule, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." The honest-belief rule applies "where the employer reasonably relied on the particularized facts that were before it at the time the decision was made." "The rationale behind the [honest belief] rule is that the focus of a discrimination suit is on the intent of the employer. If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent."
>
> Cat's paw liability, however, rests on the premise that organizational employers do not operate in a vacuum, and that a decisionmaker might rely on the recommendation of a biased lower-level supervisor. In such circumstances, the honesty or sincerity of the decisionmaker's belief is irrelevant. What is relevant is that the belief is rooted in a biased recommendation. In a cat's paw case, the allegation is that a biased subordinate intentionally manipulated the decisionmaker. Under these circumstances, the decisionmaker's intent does not matter, and consequently the honesty of the decisionmaker's belief does not matter.

854 F.3d at 380 (internal citations omitted). In short, under the cat's paw theory of liability, Wardell Everett's honest belief that Ms. Monday did not want to be recalled does not protect La-Z-Boy from liability for age discrimination if Ms. Monday can show that Teressa Everett, acting with age bias against Ms. Monday, lied to or misled Wardell Everett when she told him that Ms. Monday did not want to be recalled.

To use the cat's paw theory of liability to avoid summary judgment in La-Z-Boy's favor, Ms. Monday must come forward with some evidence of age bias on the part of Teressa Everett. *See Marshall,* 854 F.3d at 372-384. In *Marshall*, the plaintiff alleged that her direct supervisors were biased against her because she had taken FMLA leave. As evidence of this bias, she noted, *inter alia*, sarcastic comments one supervisor had made to her in front of the other supervisor about her taking leave. *Id.* at 375. Given that evidence, the *Marshall* Court concluded summary judgment in favor of the employer on the plaintiff's claim of retaliation for taking FMLA leave was not appropriate where there was a genuine issue of material fact that the supervisors were biased against the plaintiff for taking FMLA leave and these same supervisors had influenced the decision of the higher-ups who fired the plaintiff. *Id.* at 383-84.

In contrast, in *Caldwell v. Gasper*, Nos. 22-1031, 22-1032, 2022 WL 16629161, *10 (6th Cir. Nov. 1, 2022), the plaintiffs in a Title VII race discrimination action could not use the cat's paw theory to overcome the decisionmaker's honest belief that the plaintiffs had engaged in improper workplace conduct as the reason for their discipline because the plaintiffs did not present any evidence that the subordinate who influenced the decisionmaker had any discriminatory animus toward the plaintiffs. In other words, a plaintiff must "put forward convincing proof that a biased low-level supervisor influenced" one or more higher level supervisors to make the adverse employment decision at issue to overcome the decisionmaker's nondiscriminatory, honest belief. *Marshall*, 854 F.3d at 379.

In the instant case, while it is clear that Wardell Everett relied on information from Teressa Everett when making his decision not to recall Ms. Monday at the same time he recalled Perez, Ms. Monday has presented no evidence to raise a genuine issue of material fact as to whether Teressa Everett had any age based animus (or any animus at all) against Ms. Monday.

Consequently, Wardell Everett's honest belief that Ms. Monday wanted to delay her recall provides an unrebutted, legitimate, nondiscriminatory reason for recalling Perez before Ms. Monday.

To the extent that Ms. Monday is alleging La-Z-Boy should have recalled her *after* recalling Perez, Ms. Monday cannot satisfy the third element of the prima facie case for failure to recall because Ms. Monday cannot show that there was a Mech. Cell 4 position available. The evidence is unrebutted that, after La-Z-Boy brought back all Mech. Cell 4 employees except for Ms. Monday, it became clear to Wardell Everett that another Mech. Cell 4 employee was not necessary to meet the needs of the Dayton Plant, and that no other Mech. Cell 4 employee has been hired since that time.

Ms. Monday may also be attempting to use statistical information to show other reasonable evidence exists for inferring that she was denied a position because of her age.[3] Plaintiff observes that, on September 29, 2020, La-Z-Boy terminated 23 former employees with an average age of 53, while the next week, on October 5, 2020, it hired 26 new employees with an average age of 30. (Page ID ## 327-29). The Court does not find this information establishes an inference of age discrimination. Plaintiff's snapshot of a single day during a period in which hundred of employees were either recalled or hired is grossly incomplete. It offers no explanation as to whether any of the 23 terminated employees wanted to return to work, whether their former positions still existed, or whether they applied for other jobs. As to the new employees, there is no information relating to the ages of the pool of applicants for those jobs, or whether the jobs were positions already existing at the Dayton Plant, or whether they were new positions transferred to the Dayton Plant from Newton, Mississippi. "To create an inference of discrimination, 'statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the

---

[3] Plaintiffs have not attempted to explain specifically how evidence in this case establishes each element of the prima facie case of age discrimination for failure to recall or rehire.

disparity.'" *Thompson v. Fresh Products, LLC*, 985 F.3d 509, 526 (6th Cir. 2021) (quoting *Peeples v. City of Detroit*, 891 F.3d 622, 635 (6th Cir. 2018)). The Court concludes that this extremely narrow slice of purported statistical evidence is insufficiently probative to support any inference of age discrimination.

### 2. Failure to Recall Plaintiff Patton to a New Position.

Unlike Ms. Monday, Darlene Patton does not allege age discrimination on the basis that La-Z-Boy recalled the other laid-off manual spinners on second shift before Patton was recalled. Indeed, such a claim would be undermined by the fact that the other two employees on her shift were older than Ms. Patton. Rather, Ms. Patton's claim is based on La-Z-Boy's elimination of her former position after the company recalled the other manual spinners. Ms. Patton, however, cannot establish the third element of the prima facie case of failure to recall, *to wit*, that she applied for the available position or that the employer was otherwise obligated to consider her. There is no evidence before the Court that Ms. Patton applied for any available position at the company.

Moreover, the specific position that Ms. Patton had held prior to the furlough was no longer available to be filled. After recalling two older employees on the same shift to which Ms. Patton had been assigned, it is uncontroverted that Wardell Everett determined that the Dayton Plant could operate effectively with one less Mech. Cell 4 operator. Consequently, Ms. Patton's former position was eliminated. To date, that position has never been filled.

### 3. Other Claims by Plaintiffs.

Plaintiffs also allege that La-Z-Boy engaged in age discrimination for failing to rehire them into any of the new positions it advertised when it reopened the Dayton Plant in June 2020. Again, however, Plaintiffs fail to meet the third element necessary to establish a prima facie case, *to wit*,

21

each plaintiff must show that she applied for an available position or she must establish that the employer was otherwise obligated to consider her.

After La-Z-Boy reopened the Dayton Plant, there were hundreds of available positions beyond the Plaintiffs' former positions. The evidence is undisputed, however, that neither Plaintiff applied for any of these available positions. Plaintiffs did express to both Wardell Everett and Teressa Everett a general interest in returning to work; however, "[a] generalized expression of interest in a position will not qualify as an application for employment." *Grant v. Harcourt Brace Coll. Publishers*, No. 98-3829, 1999 WL 717982, * 4 (6th Cir. Sept. 9, 1999) (citing *Wanger*, 872 F.2d at 146).

On the other hand, a failure to apply for an open position can be excused in two scenarios: (1) if an employer has created an atmosphere of gross and pervasive discrimination and it is clear to the plaintiff that applying for the open position would be futile; or (2) the employer hires someone into the position at issue and does not ask for applications or post the job. *Wanger*, 872 F.2d at 145, *Russell v. Three Pillars*, No. 20-10221, 2021 WL 1388028, * 9 (E.D. Mich. April 13, 2021); *Allen v. Deerfield Mfg., Inc.*, 424 F. Supp.2d 987, 994 (S.D. Ohio 2008). For reasons that follow, the Court concludes that Plaintiff has failed to demonstrate that a genuine issue of material fact exists as to either scenario.

To excuse their failure to apply for a new position, Plaintiffs contend that, after they repeatedly informed Wardell Everett and Teressa Everett that they wanted to return to work—to no avail—they concluded that filing an application for a new position would be futile. Both Plaintiffs testified that, had they been offered a new position, they would have taken it. The Court, however, should not focus on Plaintiffs' subjective beliefs about the likelihood that they would be hired. Rather, case precedent instructs the Court to look for evidence as to whether La-Z-Boy's

Dayton Plant had a history of gross and pervasive age discrimination: (1) known to Plaintiffs; and (2) leading to a reasonable belief on the part of Plaintiffs that applying for a new position would be futile. Plaintiffs have produced no evidence whatsoever that the plant had a history of gross and pervasive age discrimination.

As to the second scenario (i.e., "the employer hires someone into the position at issue and does not ask for applications or post the job"), Plaintiffs offer no evidence that new vacant positions were filled without posting the jobs or soliciting applications. Rather, Plaintiff's contend that they should not have been required to apply for new vacant positions. The argument continues that La-Z-Boy "could have recalled [Plaintiffs] to a vacant position instead of awarding that job to someone new." (Plaintiffs' brief at 17, Page ID # 440).

Certainly La-Z-Boy *could* have recalled Plaintiffs to new vacant positions instead of posting the jobs and soliciting applications; however, there is no evidence that any La-Z-Boy policy *required* the company to do so. Nor is there any proof that La-Z-Boy engaged in such a practice with respect to other laid-off employees following the March 2020 RIF. Without reference to any evidence in the record, Plaintiffs assert that "Defendant regularly moves employees around to perform whatever job is needed." (Plaintiff's brief at 17, Page ID # 440). Absent some evidence that La-Z-Boy was moving laid-off employees into new positions without requiring an application or "bid" for the new position, Plaintiffs' statement cannot be considered by the Court.

Contrary to Plaintiff's assertions, Defendant's RIF Policy does not give an employee the right to be automatically recalled into any available position. Instead, as previously stated, the RIF Policy provides,

> Upon notification of layoff, *an employee may bid to an open and available job*. If no such job exists, the employee is not qualified for an open and available job, or the employee elects not to bid a job, then the employee will go onto a recall list for up to . . . 26 weeks. . . .

23

Plaintiffs advance a strained interpretation of this section of the RIF policy, asserting that once employees were placed on the recall list, they were *forbidden* from applying or bidding for a new position. Plaintiffs' argument continues that La-Z-Boy was *obligated* to place Plaintiffs in open and available positions after the recall process began. The Court disagrees. The RIF policy does not prevent employees who have been placed on the recall list from applying for open and available jobs. Nor does the policy require La-Z-By to rehire employees on the recall list for *any* open and available positions. The only evidence before this Court is that La-Z-Boy *required* employees on the recall list to complete applications to apply for a newly created position or an already existing different position.

Moreover, La-Z-Boy did indicate to Plaintiffs that they were eligible to apply for new/different positions. In the August 2020 letter La-Z-Boy sent to Ms. Monday and to Ms. Patton, La-Z-Boy indicated that they could apply and be rehired for other positions, *to wit*: "[i]f you reapply for employment and are rehired after your recall period. . ." (Aug. 12, 2020 letter, Page ID # 191.) Plaintiffs knew that La-Z-Boy was engaged in extensive advertising to fill positions at the plant, yet neither Plaintiff applied for a newly created position or an already existing different position. Considering all the evidence in the light most favorable to Plaintiffs, the Court cannot find that Defendant discriminated against Plaintiffs by not hiring them to fill positions for which they did not apply.

## B.    Plaintiff Monday's FMLA Claims

Plaintiff Monday asserts that La-Z-Boy violated the FMLA when La-Z-Boy "interfered with [her] rights under the [FMLA] by terminating her employment rather than allowing her to return to work" and "retaliated against [her] for exercising her rights under the FMLA by unlawfully terminating her employment." (Complaint ¶¶ 22-23, Page ID # 4).

24

### 1. Plaintiff Monday's Claim of Interference in Violation of the FMLA

The FMLA provides that an employee who has taken FMLA leave has the right to restoration to the employee's former position or an equivalent position. 29 U.S.C. § 2614(a)(1). An employer's intent is not directly relevant to an interference claim. *Render v. FCA US, LLC*, 53 F.4th 905, 914 (6th Cir. 2022). However, "[a]n employee returning from FMLA leave is not entitled to restoration unless he would have continued to be employed if he had not taken FMLA leave." *Madry v. Gibraltar Nat'l Corp.*, 526 F. App'x 593, 596 (6th Cir. 2013) (quoting *Grace v. USCAR, LLC*, 521 F.3d 655, 669 (6th Cir. 2008).

The evidence before the Court demonstrates that, on the day Plaintiff Monday would have returned to work following FMLA leave, the Dayton Plant was shut down with almost all its employees laid-off due to the pandemic. Had Plaintiff not taken FMLA leave, she nevertheless would have been laid-off.

To the extent that Plaintiff Monday is asserting that her FMLA leave status conferred upon her some priority requiring that she be recalled before other employees, she is mistaken. The FMLA provides that the right to restoration does not include "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B).

Pursuant to La-Z-Boy's recall policy found in the RIF Policy in the employee handbook, La-Z-Boy *may* recall laid-off employees, but it is not *required* to recall any laid-off employee. In this regard, the RIF Policy states, "[e]mployees will typically be recalled in the reverse order of layoff, but this may vary based on business needs or as the company in its sole discretion determines." (Page ID # 63). There is no dispute that this RIF Policy was in effect at all times relevant to this lawsuit. Moreover, while La-Z-Boy indicated to its employees at the outset of the

25

shutdown that it was projected to be temporary, the company did not foreclose the possibility of a permanent layoff. (*See* Furloughed Employees FAQ, Page ID ## 213-14) ("In the event we determine that the furlough must be extended, or that permanent cuts are required, we will notify affected employees as quickly as possible."). *See also Tubbs v. ABC Pro. Tree Serv., Inc*. No. 3:14-cv-01783, 2015 WL 3511219, *3 (M. D. Tenn. June 4, 2015) ("if an employee would have lost his job or been laid off even if he had not taken FMLA leave, an employer does not violate the FMLA by terminating that employee while he is on leave.") (internal citation omitted). Thus, the FMLA did not confer upon Ms. Monday a heightened entitlement to be restored to her prior position or an equivalent one following the shutdown and subsequent recall of employees at the Dayton Plant. For this reason, Plaintiff's FMLA interference claim is without merit.

## 2. Plaintiff Monday's Claim of Retaliation in Violation of the FMLA

Absent direct evidence, a plaintiff's claim for retaliation for exercising a right under the FMLA is analyzed under the *McDonnell-Douglas* framework, discussed *supra* 11-12. *Render v. FCA US, LLC*, 53 F.4th 905, 920 (6th Cir. 2022). To establish a prima facie case for retaliation, the plaintiff must show that:

> (1) [he] was engaged in an activity protected by the FMLA; (2) the employer knew that [he] was exercising [his] rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to [him]; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Id.* (quoting *Redlin v. Grosse Pointe Public Sch. Sys*., 921 F.3d 599, 616 (6th Cir. 2019)). It is undisputed that Plaintiff Monday exercised FMLA leave and her employer knew about it. It is also undisputed that La-Z-Boy took an adverse employment action against Plaintiff when it terminated her employment on September 29, 2020. However, Plaintiff has identified no evidence of a causal connection between her taking FMLA leave in March and her discharge five months later.

26

Assuming *arguendo*, that Plaintiff Monday could identify such a causal connection, as discussed in relation to her ADEA claim, La-Z-Boy has articulated a legitimate, nondiscriminatory reason for not recalling her as a Mech. Cell 4 operator—a reason which Ms. Monday has not demonstrated is pretextual. Further, as also previously discussed, the FMLA does not create rights for an employee that the employee would not have had if she not taken leave. *All* furloughed employees were required to apply for new positions if they were not recalled into their former positions. This requirement also applied to Plaintiff Monday and it is undisputed that she did not apply for a new position. La-Z-Boy had no obligation to rehire her into a new position for which she did not apply. The Court concludes that Plaintiff Monday has raised no genuine issue of material fact as to either of her FMLA claims.

## V.     Conclusion

For the reasons stated herein, the Court concludes that no genuine issue of material fact exists as to either Plaintiff's ADEA claims, and La-Z-Boy is entitled to judgment as a matter of law on said claims. The Court further concludes that no genuine issue of material fact exists as to Plaintiff Monday's FMLA claims, and La-Z-Boy is entitled to judgment as a matter of law as to these claims as well. Therefore, Defendant's Motion for Summary Judgment shall be **GRANTED** and an appropriate order entered dismissing this action in its entirety and entering judgment in favor of Defendant.

**SO ORDERED**.

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE